UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
DOMENICO IANNUCCI,

               Plaintiff,              MEMORANDUM AND ORDER
                                   15-CV-3493 (DRH)

               -against-

LEWIS TREE SERVICE, INC., ET AL,

               Defendants.
-------------------------------X
A P P E A R A N C E S:

For the Plaintiff:
    Hackett Law P.C.
    401 Franklin Avenue
    Garden City, New York 11530
       By: Patrick J. Hackett, Esq.

For Defendants DHS, FEMA and DOI:
    Seth DuCharme
    Acting United States Attorney
    United States Attorney's Office
    610 Federal Plaza
    5th Floor
    Central Islip, New York 11722
       By: Vincent Lipari, A.U.S.A.

HURLEY, Senior District Judge:

      By complaint filed on June 16, 2015, Plaintiff Domenico

Iannucci ("Plaintiff" or "Iannucci") brought this action under

the Federal Tort Claims Act ("FTCA") against Defendants

Department of Homeland Security ("DHS") – Federal Emergency

Management Agency ("FEMA") and Department of the Interior

("DOI"), collectively, "Federal Defendants"), and for common law

negligence and violations of New York Labor Law ("NYLL") §§ 200,

240, 241, against Defendants Lewis Tree Service, Inc. ("Lewis")

and Edgewood Industries ("Edgewood"), (collectively, "Private

Defendants").

All Defendants moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 via three separate motions. The Private Defendants' motions were granted while that of the Federal Defendants was denied by a single decision filed on April 3, 2019 (ECR # 77).  The remaining parties then agreed, and the Court approved, the trial being bifurcated with the Court serving as the trier-of-fact.

A bench trial on liability was conducted before the undersigned on November 3, 2020, with the parties submitting Proposal Findings of Fact and Conclusions of Law and related materials through to the end of December of 2020.

The purpose of this decision is to provide my Findings of Fact and Conclusions of Law on the liability phase of the case pursuant to Federal Rule of Civil Procedure 52.

Brief Overview of Nature of Dispute and
Contentions of Parties

This case concerns an accident that occurred sometime between 2:00 A.M. and 3:00 A.M. on November 21, 2012 when Plaintiff fell from the payloader he was delivering to Floyd Bennett Field and suffered serious injuries.  He contends that a federal employee or agent designated a particular location to unload the machine from the trailer on which it was being transported but that the lighting at that location was wholly inadequate for the safe performance of that task.  That lighting

2

deficiency is cited by Plaintiff as a proximate cause of the accident.

Iannuacci explains that while dismounting the payloader, via using the ladder permanently affixed to its side – see Pl.'s Ex. 4 – he fell near the bottom of his descent.  All he recalls is that, while attempting to navigate from the ladder's bottom step to the trailer itself, something happened which resulted in him ending up on the ground, unconscious.

The Federal Defendants' defense is multifaced.  It includes that Iannucci did not testify that he took a misstep after he looked but couldn't see the next lower surface. Moreover, the Federal Defendants underscore, he admits that he had previously gone down the ladder on that very machine hundreds, if not thousands of times by simply reaching with one foot and then the other, or "feeling" for the next lower surface.

Federal Defendants also challenge the sufficiency of Plaintiff's proof as to the part of the payloader from which he fell.  The hospital record for his November 21, 2012 visit indicates he told the treating physician, in explaining how he was injured, that he fell from the payloader's "platform," absent any mention of the ladder and its stairs.

In addition, the Federal Defendants contend that Plaintiff has failed to prove (1) that the person who indicated where to unload the machine was an employee or agent of the

Federal Defendants, (2) that the lighting at the scene of the accident was inadequate, and (3) assuming, arguendo, that is was, that the fault lies with Federal Defendants as distinct from the New York City Department of Parks and Recreation.  That latter entity had a contract with the United States Department of the Interior permitting their use of the section of Floyd Bennett Field where the accident happened for the purpose of processing debris removed from the surrounding areas caused by Hurricane Sandy.

And finally, Federal Defendants complain that Plaintiff did not advise anyone associated with the federal government or Floyd Bennett Field of the November 2012 incident prior to filing his "Claim for Damages, Injury, or Death" with the National Parks Service on November 24, 2014.  (Defs.' Ex. A.)  As a result of that unexplained two year delay, they argue, their ability to promptly investigate the accident in keeping with their standard protocol was derailed.

Against the above backdrop, the Court will now turn its attention to its Findings of Fact and Conclusions of Law.

<u>Findings of Fact</u>

A.  <u>Hurricane Sandy Relief Efforts at Floyd Bennett Field</u>

1.  Floyd Bennett Field is located in Brooklyn and is part of federally owned Gateway National Recreational Area.  It is operated by an agency of the United States Department of the

Interior ("DOI"), viz. the National Park Service ("NPS").  Joint
Pretrial Order [ECF 63] at 3.

      2.  On October 29, 2012, Hurricane Sandy made landfall
in the New York City and Long Island area.  (Joint Pretrial Order
at 3).

      3.  From late October through December 2012, Floyd
Bennett Field was used as a staging area for Hurricane Sandy
clean-up and relief efforts, including storage of emergency
equipment, fuel, water and food.  (Transcript of November 3, 2020
Trial ("Tr.") at 106-107.)

      4.  Hurricane Sandy relief efforts at Floyd Bennett
Field were conducted 24 hours a day.  (Tr. 122-123.)  A constant
stream of vehicles entered Floyd Bennett Field at all times of
the day and night.  (Tr. 121-122.)

      5.  After Hurricane Sandy devastated the Metropolitan
area,  NPS and the New York City Department of Parks and
Recreation ("NYC Parks") entered into a Special Use Permit
("SUP").  (Defs.' Ex. 8.)  Under that contract, NYC Parks was
authorized to use a designated portion of Floyd Bennett Field for
the disposal of hurricane debris.  As explained in the "Summary
of Permitted Activity" portion of contract:

> New York City Department of Parks and
> Recreation ("Permittee") is depositing storm
> debris collected from streets, homes, and
> utility lines at Floyd Bennett Field in
> Brooklyn, NY.  Other New York City agencies
> and city-approved contractors are assisting

>           Permittee in this operation.  These other
>           agencies included NYC Department of
>           Transportation, NYC Department of Sanitation,
>           and eight approved NYC contractors.  One NYC
>           contractor will be on-site chipping wood
>           debris.  All debris will be removed by NYC
>           Sanitation at the conclusion of clean-up
>           operations, or as soon as is feasible.  (Id.
>           at 1.)

B.  Plaintiff's Minimal Involvement in Relief Effort

6.  NYC Parks directed former Defendant Lewis under a preexisting contract, to collect and move trees damaged by Hurricane Sandy to Floyd Bennett Field.  Lewis, in turn, subcontracted with former Defendant Edgewood to provide a bulldozer and payloader for the job.  Edgewood then rented the two machines from DLI, Inc., a company owned and operated by Iannucci.  Plaintiff was injured while delivering the second of the two machines, viz. the payloader, to Floyd Bennett Field in the early morning hours of November 21, 2012 as detailed infra.

7.  Before arriving at Floyd Bennett Field on the evening of November 20, 2012, Plaintiff had never been to that location (Tr. 54) or spoken to anyone from DOI, DHS, FEMA or NPS regarding the Hurricane Sandy operations at Floyd Bennett Field (Tr. 53-54.)  His sole contact with the project was through Edgewood as just explained.

C.  Plaintiff's Delivery of Bulldozer to Floyd Bennett Field

8.  On November 20, 2012, in the early evening, Plaintiff and William Bahrenburg ("Bahrenburg")(a longtime friend

6

and former DLI employee), loaded a bulldozer on a 40 foot
trailer, attached the trailer to a tractor, and drove from a work
site in Melville, Long Island to Floyd Bennett Field.  (Tr. 11-
14.)

9.   Plaintiff and Bahrenburg arrived at Floyd Bennett
Field later that evening, at about 9:00 p.m or 9:30 p.m.  (Tr.
67.)  They passed through a check point at the entrance where
they received permission to enter Floyd Bennett Field.  (Tr. 130,
148.)

10.   They drove directly to, and next stopped at a
parking lot full of wood chips, where Bahrenburg was told to
unload the bulldozer and, by implication, later the payloader.
(Tr. 57-59; Tr. 130; Tr. 148-151.)

11.   Both Plaintiff and Bahrenburg testified that the
person who said where to unload the machinery was with Homeland
Security.  Bahrenburg said that the individual "identified
[himself] as Homeland Security" and as "being in charge of . . .
everything going on."  (Tr. 131.)  Iannucci testified that
although he didn't talk to the person or overhear his
conversation with Bahrenburg, the trailer from which he alighted
was marked as a Homeland Security vehicle.  (Tr. 57.)

12.   However, government witness Otis McDaniel
("McDaniel"), testifying remotely on consent from Georgia,
indicated that: (a) FEMA is a branch of the Department of

Homeland Security, (Tr. 163);(b) he joined FEMA in 2008, (Tr. 163);(c) as a FEMA employee he was assigned to oversee the activities of around 20 FEMA workers at the Floyd Bennett Field staging area following Hurricane Sandy, (Tr. 164;(d) FEMA's role was to make available needed basic supplies for people effected by the hurricane such as water and blankets, (Tr. 164); and (e) to accomplish that mission FEMA had hundreds of fifty three foot trailers located at the staging area loaded with commodities for individuals in need. (Tr. 164.)

    13. Most importantly for present purposes, McDaniel credibly testified that FEMA's hours at the site were from 7:00 a.m. to 7:00 p.m., give or take 15 minutes. (Tr. 164-165.) Upon exiting their respective work stations, the FEMA employees would "get to their cars and head to their hotels." (Tr. 165.)[1]

---

    [1] McDaniel testified about FEMA employees under his supervision, and their hours at the staging area. When asked by Plaintiff's counsel whether he was aware of any other persons from FEMA working at some other site at Floyd Bennett Field during the relevant time period, he answered not to his knowledge. (Tr. 165.) No witnesses employed at the facility as federal staff members at the time or associated with New York City Parks were called to suggest that McDaniel's knowledge about FEMA personnel at the Field was incomplete.

    Unlike FEMA's employees who left Floyd Bennett Field at approximately 7:00 p.m. each evening, i.e. well before Iannucci and Bahrenburg arrived at the location on November 20th, NYC Parks was contractually required under the Special Use Permit to have a representative "on-site at all times." (Gov't's Ex. B, ¶ 22.) Cf. Tr. 107 (United States Park Police Officer Leary explaining that the New York City Sanitation Department "had a big operation" at the staging area and concomitant "responsib[ility]" for the hurricane clean-up activities.

14.   Based on the above, I don't doubt that Plaintiff and Bahrenburg saw FEMA marked trailers upon entering Floyd Bennett on November 20th at about 9:00 p.m.   However, I do not accept as accurate their shared recollection that the person who designated the place to unload the bulldozer – and, by implication, the payloader – was affiliated with FEMA, in part, because I find that all FEMA's employees had left the location hours before consistent with McDaniel's testimony.   See also (Tr. 150-151) (at a pretrial disposition, Bahrenburg testified that the person who told him where to unload the bulldozer was a "guy with [a] plaid shirt" of unknown affiliation who came from an unlabeled "business-like trailer.")   (Tr. 150-151.)   Bahrenburg's earlier deposition testimony, given closer in time to November 2012, renders his contrary trial testimony about a FEMA person telling him where to unload the machine(s), problematic.

15.   In sum, Plaintiff has failed to establish by a fair preponderance of the credible evidence[2] that the person who told him, through Bahrenburg, where to unload machine(s) was an employee or agent of Federal Defendant.

---

[2]   Plaintiff maintains that a lesser or relaxed standard of proof should be applied in evaluating the evidence before the Court based on the "Noseworthy Doctrine" as enunciated in Noseworthy v. City of New York, 298 N.Y. 76, 80 N.E. 2d 744 (1948 and its progency.   (Pl.'s Prop. Findings of Fact and Concl. of Law (ECF 92) at 1.)   That proposition is discussed, and rejected in the Conclusions of Law portion of this Memorandum and Order, infra.

9

D.  Conflicting Testimony of Iannucci and Bahrenburg as
    to Lighting at Staging Area When Bulldozer Delivered

16.  With respect to the lighting at the staging area when the bulldozer was unloaded, Bahrenburg described it as "on" (Tr. 132), and in response to a question on cross-examination, agreed that the area was "well lit." (Tr. 152.)  In any event, the unloading of the bulldozer was accomplished without incident. (Tr. 132; see also Tr. 25.)

However, Iannucci, unlike Bahrenburg, described the lighting during the first delivery as being "very dim," (Tr. 20), with the "light towers . . . in the parking lot" being turned "off." (Tr. 20.)  The condition was so bad, Plaintiff reports, he complained to "somebody" – unidentified by name or affiliation – that "we need lights . . . [t]his is dangerous." (Tr. 20.)[3]

E.  Plaintiff's Second Delivery, i.e. of the
    Payloader, to Floyd Bennett Field

17.  After the bulldozer was unloaded at the staging area, Iannucci and Bahrenburg returned to Long Island to retrieve the payloader. (Tr. 25.)

---

[3]  Interestingly, upon returning to the site with the payloader sometime after 2:00 a.m. on November 21st - when both Iannucci and Bahrenburg described the lighting as poor – neither recalls that any effort was made to contact anyone to remedy the perceived dangerous condition. (Tr. 69.)

Presumably that was not due to the absence of individuals in the area given the time of day; as government witness United States Park Police Officer James Leary testified the activity at the site was "24 hours a day nonstop." (Tr. 123.)

18.   Plaintiff and Bahrenburg arrived back at Floyd
Bennett Field at about 2:00 a.m. on November 21, 2012. (Tr. at
68.)

19.   They drove directly to the same parking lot to
drop off the payloader, near where they had left the bulldozer.
(Tr. 31.)

20.   They did not speak to anyone on this second trip
before stopping because they had already been directed on the
first trip where to leave the equipment.  (Tr. 68.)

21.   Once there, Bahrenburg climbed the ladder attached
to the side of the payloader to reach the cab and start the
machine's engine.

However, the door to the cab was locked with the
key inside.  (Tr. 79.)  He thereupon came down the ladder, walked
several hundred feet to where the bulldozer was parked for the
purpose of retrieving the universal key from that machine.  (Tr.
137-138.)

22.   With the universal key in hand, Bahrenburg
returned to the payloader.  Not seeing Iannucci, he walked around
the area and "called out his name" to no avail.  He then "saw him
on the ground."  Bahrenburg said he wasn't able to see Iannucci
until he was "very close to him" because there "was no light,
very low."  (Tr. 138.)  So in this instance regarding the
lighting, his testimony dovetailed with Plaintiff's unlike with

11

respect to the bulldozer.

When asked by Bahrenburg what happened, "[h]e said he fell."[4]  Although Iannucci was seriously injured from the fall, he did not realize that at the time and told Bahrenburg "he was going to be fine."  (Tr. 140.)

F.  General Procedure for Descending From the Cab,
    i.e. the Driver's Booth of the Payloader,
    and Details Concerning the Ladder

23.  The payloader has four steps which are used to go up and down between ground level and the platform.  (Tr. 71-72.) The bottom step is flexible.  (Tr. 73.)

24.  The platform is a flat space towards the top of the payloader, abutting the door to the driver's booth or cab. (Tr. 72.)  It is about seven and a half feet above the ground. (Tr. 73.)  The distance increases to around 9 to 10 feet when the pay loader is on the trailer.  (Tr. 96.)

25.  Each step is 4 inches wide, with a slip-proof steel surface. (Tr. 71.)

---

[4]  After the fall, Bahrenburg and Iannucci, with Iannucci driving, drove the tractor trailer from Floyd Bennett Field in Brooklyn to Westbury in Nassau County.  Yet neither during that trip nor, indeed, at anytime thereafter, did Plaintiff tell his close friend Bahrenburg from what part of the payloader he fell. (Tr. 159.)  Was it from this "platform" outside the cab as reflected in the hospital record, Defs' Ex. H, after Iannucci told the doctor "how [he] got hurt," (Tr. 90-94,) or was it from the bottom step of the ladder on the side of the payloader as he testified at trial?

26.   Two handrails, a lower and higher set, run along both sides of the steps and end several feet about the platform. Thus "there's always something to hold onto."  (Tr. 73.)

27.   When the payloader is mounted on the trailer as it was here, wooden planks are placed on the trailer's outriggers, directly below the bottom, flexible step.  (Tr. 76, 84.)

28.   The flexible step is about 14-16 inches above the plank.  (Tr. 77.)

29.   A person descending the payloader, when mounted on the trailer, would, while continuing to hold the handrails with both hands, put a foot on the flexible step and then lower one foot and then the other to the plank below.

30.   When both feet were on the plank, and while continuing to hold the handrail with <u>both</u> hands, a person would step <u>down</u> 18-24 inches from the plank to the ground.  (Tr. 77-78.)

31.   A person going up or down the ladder could locate each step and the plank by feeling with his foot before placing his weight on the next level, without needing to look at the steps or plank.  (Tr. 74-76, 82-84, 156.)

32.   Safe practice requires that a person dismounting the payloader hold the handrails at all times with both hands. (Tr. 74, 156.)

13

G.  Manner in Which Iannucci Descended the Payloader's
    Stairs Generally and How he did so on November 21, 2020

       33.  Plaintiff's company has owned the subject
payloader since 2000 and he has navigated its stairs "thousands
of time."  While doing so, he "always hold[s] the rails."  (Tr.
74.)

       34.  "Most of the time," he doesn't look for the next
lower step or level; instead, "[y]ou can feel it.  You just go
down.  As you go down, you feel the steps."  (Tr. 74.)

       35.  However, on some occasions when its dark,
Iannuccci testified at trial, you must also look for the next
step.  (Tr. 74.)

       36.  But in describing his fall, he never said that he
looked for the plank after the fourth or bottom step or, if he
did, he was unable to see it.  What he said about the lighting
was simply that at the top of the ladder it was a "little better"
than at bottom which he described as "darker."  (Tr. 38.)
Critically absent from his testimony is credible information
establishing that poor lighting, assuming such was the case, was
a proximate cause of his fall and resulting injuries.

       37.  Also Iannucci's activities after ascending the
payloader while Bahrenburg was checking the nearby bulldozer for
a universal key, warrant mention.  Upon reaching the platform and
finding the cab locked, he endeavored to gain entry by forcefully
"pulling" on the locked door and "pushing" on the windows but

14

"nothing worked."  (Tr. 82.)  Perhaps he fell from the "platform"
via misdirected force in trying to get into the cab consistent
with the notations in the hospital record about his injuries
being caused as a result of a fall from a specific part of the
machine, viz. its "platform."[5]  Or perhaps,  the causative
element was something else such as, e.g., a foreign substance
like a smudge of grease or mud on the surface of the fourth step,
or the plank below.

38.  Plaintiff does not know why he fell, (Tr. 80),
nor,  more importantly for present purpose, do I as the trier-of-
fact based on evidence presented.

39.  Plaintiff surmises that he fell due to inadequate
lighting, impliedly suggesting that the last thing he did prior
to his fall was unsuccessfully looking for next step down in his
descent.  To the extent I'm being asked to infer that he did so
on November 21, 2012, I decline to do so for several reasons
including the following:

a) a review of the photographs of the payloader in

---

[5]  See Winthrop-University Hospital record attached to
Defs.' Ex. H at page 000038 under "BRIEF HISTORY" OF "OPERATIVE
REPORT" and hospital "DISCHARGE SUMMARY" at page 000057.

Parenthetically, the severity of Iannucci's injuries would
seem more consistent with a fall from the platform which, when
the payloader is resting on the trailer, is approximately nine to
ten feet above ground, (Tr.95-96), than from the bottom step of
the ladder with a corresponding distance to terra firma being
less than half that distance.

evidence, particularly Plaintiff's Exhibits 4 and 6, as well as
Defendants' Exhibits F (000003, 000007 and 000011), suggest —
given the limited space separating a person on the ladder and the
side of the payloader — that it would have been difficult for
Plaintiff to position himself so as to be able to see the
location and surface of the plank below.  And, in any event, why
would he bother?  As noted, Plaintiff had made the same descent,
on the same machine repeatedly over the years "feeling" his way
down without incident.  Assuming, <u>arguendo</u>, that something about
the plank or the lighting on the plank contributed to the fall,
Plaintiff acknowledged at the trial that he earlier explained at
a pretrial deposition:

> "QUESTION:    Outrigger plank, when you step
>              from the last step down to the
>              trailer, would you have to put
>              your foot in or if you put
>              your foot flat down, will it
>              be completely on the plank or
>              would any part of your foot be
>              hanging over?
>
> "ANSWER:     I don't know.  I don't look.
>
> "QUESTION:    Before the date of the
>              accident, this payloader
>              was on the trailer
>              before?
>
> "ANSWER:     Yes.
>
> "QUESTION:    And you have gone up and
>              down the ladder on this
>              trailer.
>
>              When you would come down
>              the ladder, when your foot

16

                              came from the last step down
                              to the trailer, would your
                              entire foot be on the plank or
                              would any part of your foot be
                              hanging over the plant?

        "ANSWER:      Just going down the ladder
                      probably, maybe, three-quarters
                      of the foot would be on the
                      plank.

        "QUESTION:    And a quarter of your foot
                      would be hanging over the plank?

        "ANSWER:      I can't – I don't – I <u>never</u> look,
                      to be honest with you.

                      Do you remember those questions and
                      answers?

        A.            Yes.

(Tr. 86-87 (emphasis added.)

        40.  Having observed Plaintiff's demeanor while

testifying, and considering the totality of the evidence, I find

that it is far more likely that his admission at deposition about

"never look[ing]" for the plank when dismounting from the

payloader more nearly represents the truth to the extent it

differs from his trial testimony on that point.

        Which is to say, even if it is assumed for argument

sake, that the Federal Defendants were responsible for the

purported lighting deficience at the hurricane staging area,

Plaintiff has failed to establish a link between the lighting

conditions at the site and the injuries he sustained.

H.  Entity Responsible for Lighting at the Hurricane
    Sandy Staging Area

        41.  As noted earlier, NYC Parks, under a contract

with the United States Department of the Interior, was utilizing

a portion of Floyd Bennett Field for its post-Sandy clean-up

operation.  FEMA, on the other hand, moved multiple federally

marked trailers to the site loaded with supplies, such as bottled

water and blankets, for area residents in need of such basics

because of the storm.

        42.  McDaniel and his FEMA team of around twenty

members, operated out of two field office-trailers and a mobile

office.  (Tr. 170.)  To perform its function, FEMA brought to the

site "from Atlanta approximately ten set of lights."  (Tr. 166.)

        43.  FEMA was in charge of those lights.  Its employees

would turn them on every night before leaving and turn them off

the next morning.  (Tr. 166-167.)  FEMA was not in charge of any

other of the numerous lights at Floyd Bennett Field.  (Tr. 167.)

        44.  "[E]verybody else in the area had lighting also"

as explained by McDaniel.  (Tr. 166.)

        45.  The question becomes which individual or entity

was responsible for the lighting conditions at the accident

scene.  Was it a Federal Defendant or, e.g., NYC Parks operating

through the City's Sanitation Department?

        The evidence adduced at trial is sufficiently muddled

to preclude me from finding for Iannucci on this disputed point

18

consistent with the requisite standard of proof.

46.  I do find that Plaintiff has established that the lighting in area of his fall was dim based on his testimony and that of Bahrenburg, but the issue as to whom shoulders the responsibility for that shortcoming remains an enigma.

47.  By way of partial synopsis, Plaintiff has failed to establish by a fair preponderance of the credible evidence that (a) a federal employee or agent designated the place to unload DLI Contracting's machines in November 2012, (b) that inadequate lighting at that site caused, in whole or in part, his fall from the subject payloader, or (c) even if, arguendo, it did, that the lighting at the accident scene was under the control of the Federal Defendants.

### Conclusions of Law

(1) Standard of Proof

Plaintiff contends that some standard less than a fair preponderance of the credible evidence should by utilized in evaluating his proof based on his momentary loss of consciousness and, purportedly, his memory following the fall under the holding in Noseworthy v. City of New York, 298 N.Y. 76 (1948) and its progency.

A perusal of the decision in Noseworthy indicates it is irrelevant to the issue under discussion.  In Noseworthy, the injured person died allegedly as a result of the Defendant's

negligence.  In the suit commenced by his administrator, the New York Court of Appeals found error in the trial court's refusal to instruct the jury thusly: "[I]n a death case such as this, the plaintiff is not held to the high degree of proof required in a case where the injured person may take the stand and give his version of the happening of the accident."  Id. at 80.

However, the Noseworthy doctrine is not limited to death cases.  It may be invoked where the aggrieved party has suffered an inability to recall details of the accident because of the Defendants' negligence or intentional conduct.  But to establish that nexus, Plaintiff is required to "present expert evidence establishing his loss of memory and its causal relationship to defendants' conduct."  Mancia v. Metro. Transit Auth. Long Island Bus, 790 N.Y.S.2d 31, 31 (2d Dept. 2005).  See also Gervacio v. Zall, 345 F. App'x 638, 639 (2d Cir. 2009)("We agree with the District Court that . . . Noseworthy [is] inapposite [because] plaintiff failed to supply any expert evidence demonstrating the existence of his amnesia or a causal relationship with the collision with [defendant]")(citation and internal quotation marks omitted).

The absence of the required expert testimony is fatal to Plaintiff's position that a relaxed measure of proof is warranted in this case.  Accordingly, a fair preponderance of the credible evidence is the appropriate measure.

20

2.   Plaintiff has Failed to Establish the
     Proximate Cause Prong of His Negligence
     Cause of Action

        To partially reiterate, Plaintiff does not know why he
fell.  The last thing he recalls is reaching with his foot from
the ladder's bottom step for the trailer's plank below, a process
he had previously performed by "feel" scores of times during the
twenty years plus he had owned the machine.

        Although he did not testify that he looked for the
plank during the dismounting process on November 21, 2012, he
surmises that inadequate lighting in some unexplained fashion was
at play.  But conjecture and proof are distinct concepts.

        Plaintiff's proof is also insufficient as to his
related theories of liability as explained in the Findings of
Fact section supra.

                            CONCLUSION

        For the reasons detailed in the Findings of Fact and
Conclusions of Law set forth supra, Federal Defendants are
entitled to judgment in their favor dismissing the Plaintiff's
claim. The Clerk of Court is directed to enter judgment
accordingly and close the case.

        SO ORDERED.

Dated: March 22, 2021
       Central Islip, New York


                              DENIS R. HURLEY, U.S.D.J.

                                21